**WO**

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Harmon, Inc., a Minnesota corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Optima Construction, Inc., an Arizona corporation; OPTIMA Camelview Village, LLC, an Arizona limited liability corporation,<br><br>Defendants. | No. CV-09-01393-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the Motion For Summary Judgment filed by Defendants Optima Construction, Inc. ("Optima Construction") and Optima Camelview Village, LLC ("Optima Camelview") (collectively, "Optima"). (Doc. 51). For the reasons set forth below, the Court denies the Motion.[1]

**BACKGROUND**

Optima Construction is an Arizona construction corporation that builds luxury condominium projects in Phoenix and Scottsdale, Arizona. Harmon, Inc. ("Harmon") is a Minneapolis-based contractor who designs, constructs, and installs curtain wall systems.

---

[1] The parties' requests for oral argument are denied because oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

Optima Construction and Harmon entered into a negotiated subcontract ("the Subcontract") whereby Harmon would construct glass-curtain-wall and decorative-stone panels for the eleven-building Optima Camelview Village project. (Doc. 54 at ¶¶ 1, 3, 6; Doc. 56 at ¶ 1). The Subcontract states that Harmon "shall furnish all necessary engineering, supervision, labor, tools, equipment, and hoisting and shall furnish and install all materials necessary for and incidental to a complete, warranted, (i) 100% weather and watertight exterior enclosure of eleven (11) above grade structures." (Doc. 52, Ex. 3). As required by the Subcontract, Harmon was to begin work on the first four buildings on October 17, 2005 and to complete these buildings by May 19, 2006. *Id.* Thereafter, "the start dates for Exterior Wall Enclosure installation on the remaining individual building(s)" were to be "in accordance with paragraph 1.c" of the Subcontract with "Work continuing uninterrupted to completion in no more than four (4) months from an individual building's start date." *Id.* Paragraph 1.c of the Subcontract states,

> Actual start of the installation of the Work shall be set in a notice to proceed ("Notice") issued by the Contractor [Optima Construction]. Said Notice shall be issued no sooner than twelve (12) weeks in advance of the start of window installation in any building and no sooner than one month after any previously issued Notice [u]nless otherwise agreed to in writing . . . .

*Id.* The Subcontract further states,

> [Harmon] understands and agrees that this contract [the Subcontract] represents the entire Agreement between the parties and that no other agreements either verbal or written that are material to the Work of the Agreement will be honored by [Optima Construction]. It is further understood and agreed that all agreements pertaining to means, methods, access to and materials used to complete the Work have been written into this Agreement and that this Agreement shall govern all disputes between the parties.

*Id.*

In connection with the Optima Camelview project, Harmon independently entered into subcontracts with seven additional companies to assist with the work. (Doc. 56 at ¶ 27). Harmon arrived on-site in August 2005 to initiate work, but experienced unexpected delays allegedly caused by Optima. (*Id.* at ¶ 28–29). During the period of August 2005 to July 2007, work progress was delayed due to conditions allegedly outside of Harmon's control, resulting in unforseen expenses for Harmon and its subcontractors. (*Id.* at ¶ 33–34). On July

12, 2007, in an attempt to recoup those losses, Harmon presented Optima with a preliminary claim for equitable relief in the prospective amount of approximately ten million dollars. (*Id.* at ¶ 36). Following the preliminary claim, Harmon and Optima initiated negotiations to reach a mutually-acceptable settlement. On September 5, 2007, David Hovey (President and founder of Optima Construction), Thaddeus Lenick, Jr. (a Senior Vice President of Optima Construction), and Dennis Pilkinton (then Vice President of Operations at Harmon) met to discuss Harmon's claim. (Doc. 56 at ¶ 42). At that meeting, Mr. Hovey and Mr. Pilkinton agreed that Optima would pay Harmon $2,600,000 cash and an additional $750,000 for outstanding change orders. *Id.* Following this initial agreement, Mr. Pilkinton and Mr. Hovey tasked their respective subordinates and attorneys with negotiating the terms of a settlement agreement. (Doc. 54 at ¶ 28). During the ensuing months, the parties exchanged multiple "drafts" in furtherance of a mutually-acceptable written memorialization, with both parties suggesting changes to the proposed written agreement. (Doc. 56 at ¶¶ 52–84). On June 25, 2008, the parties agreed to meet in Arizona on July 15 to sign a final settlement agreement. (*Id.* at ¶ 81). On the morning of July 15, Harmon's in-house counsel, Tim Bettenga, sent Optima's counsel, E. Jeffery Walsh, an email stating, "I have reviewed the attached latest version [of the draft] and I believe it matches everything we discussed and agreed upon with one [typographical] exception . . . I have not spoken with Dennis or Tom yet this [a.m.], so we may have additional comments. Thank you and I look forward to getting this resolved." (Doc. 53, Ex. 33). At the meeting, Mr. Hovey refused to sign the settlement agreement, alluding to the changed economic climate and stating that the agreement was not satisfactory to him. (Doc. 54 at ¶ 66). Harmon initiated this action against Optima on July 1, 2009, alleging (1) breach of contract, and (2) unjust enrichment. (Doc. 1).

## LEGAL STANDARD

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."

1  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the
2  evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no
3  genuine issue as to any material fact and that the movant is entitled to judgment as a matter
4  of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the
5  suit will preclude the entry of summary judgment, and the disputed evidence must be "such
6  that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty
7  Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**I.     A Question of Fact Exists as to Whether the Parties formed a Binding Contract**

A contract may be formed even if not formally executed, if it is clear that the parties intended to bind themselves to the terms. *AROK Constr. Co. v. Indian Constr. Servs.*, 174 Ariz. 291, 295, 848 P.2d 870, 874 (Ct. App. 1993) (holding that "the overriding question is whether the parties intended to contract"). For an enforceable agreement to exist, there must be "a bargain in which there is a manifestation of mutual assent and a consideration." *Schade v. Diethrich*, 158 Ariz. 1, 8, 760 P.2d 1050, 1057 (1988) (citing the Restatement (Second) of Contracts ("Restatement") § 22 (1981)). The existence of written documentation of an agreement does not automatically render an oral agreement unenforceable. Under Arizona law, "in cases in which the parties to an oral agreement contemplate the later execution of a written document, the *fact-finder* must resolve whether the parties intended the written document to be a mere memorialization of an already binding oral agreement, or whether they intended to be bound only upon execution of a formal, written instrument." *Tabler v. Indus. Comm'n of Ariz.*, (202 Ariz. 518, 521, 47 P.3d 1156, 1159 (Ct. App. 2002) (emphasis added); *see also AROK*, 174 Ariz. at 299, 848 P.2d at 878 (holding that, "even if the parties anticipated making a written agreement, that fact alone does not preclude as a matter of law a *jury finding* that an oral contract was made") (emphasis added); *Burkett v. Morales*, 128 Ariz. 417, 419, 626 P.2d 147, 148 (Ct. App. 1981) (holding that, "[w]hether the parties intend to be bound only after the execution of a formal written agreement is a *question of fact*") (emphasis added). However, where it is clear that the parties intend to be bound only by a signed, written document, parties have "no right to rely on [oral] representations . . . as to the

- 4 -

terms of the agreement." *Lininger v. Sonenblick*, 23 Ariz. App. 266, 268, 532 P.2d 538, 540 (Ct. App. 1975).

Construing the facts in a light most favorable to Harmon, the Court finds that there are questions of material fact as to whether the parties entered into an enforceable agreement. According to Mr. Pilkinton's affidavit, the September 5, 2007 meeting:

> [u]ltimately resulted in a deal whereby the Optima Entities would pay approximately $750,000 in change orders . . . along with $2.6 million in cash. The $2.6 million . . . included money that was to be paid to Harmon's subcontractors/vendors to settle their respective equitable adjustment claims. The agreement also contemplated that various construction site issues be worked out. These included, among other things, provisions of men and material hoists, construction site access and material storage locations. It was also contemplated that the lawyers for each side would work out whatever additional legal terms were necessary to reduce the agreement to writing.

(Doc. 56, Ex. U at ¶ 28). The affidavit further asserts that the purpose of the settlement process was to "make sure that Harmon and its subcontractors/vendors would stay on the job and the project would get completed in a timely fashion." (*Id.* at ¶ 29). Shortly after the meeting, Mr. Pilkinton emailed his subordinates and told them that a deal had been reached for $2.6 million. (*Id.* at ¶ 30). In light of these facts, a reasonable jury could conclude that Harmon and Optima intended to be bound by the terms of the oral agreement. For example, the fact that the parties reached an agreement as to the settlement amount is sufficient for a jury to conclude that there was an offer and acceptance; consideration may be evinced by the exchange of promises to pay and to perform work in an expeditious manner. Accordingly, the oral agreement was not so indefinite on its face to fail as a matter of law. *See Schade*, 158 Ariz. at 10, 760 P.2d at 1060 (citing *Henderson Bridge Co. v. McGrath*, 134 U.S. 260, 275–76 (1890) (holding a promise to do "what was right" enforceable so long as it was made with contractual intent); *Brennan v. Employers' Liability Assurance Corp.*, 213 Mass. 365, 367, 100 N.E. 633, 634 (1913) (holding that a promise to "make it right" did not fail for indefiniteness since "[j]uries are constantly solving such problems"); Restatement § 33 (stating that, "the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or left to be agreed upon")).

Optima asserts that the parties intended to be bound only upon the execution of a written agreement. Optima supports this argument by stating, "Harmon does not cite to a single fact to support its position that the parties intended to be bound by an oral agreement—because it cannot." (Doc. 59 at 7). However, Harmon has provided evidence upon which a jury could find that an agreement was formed. The facts of the case do not make it clear that the parties intended to be bound only upon the execution of a written document. The mere fact that the proposed written draft of the settlement agreement includes signature blocks does not demonstrate, as a matter of law, that the parties intended to be bound only upon formal execution. *See AROK*, 174 Ariz. at 299, 848 P.2d at 878 (explaining that parties may assent even if they also agree to adopt a written memorialization and finding that "[f]ormal execution may be a mere formality and have little to do with the actual existence of the contract") (quoting Michael S. Simon, Construction Claims and Liability, § 5.6 at 112 (1989)).  Finally, Optima cites extensively to *Johnson Int'l, Inc. v. City of Phoenix*, 192 Ariz. 466, 967 P.2d 607 (Ct. App. 1998) in support of its assertion that no contract was ever formed. The facts of *Johnson*, however, are inapposite. Although *Johnson* is similar in that it involved a breach of contract claim arising out of the exchange of drafts, it differs significantly from the present facts because it involved three independent parties. 192 Ariz. at 468–69, 967 P.2d at 609–10. In *Johnson*, the contract between Johnson and the City of Phoenix was at all times subject to the approval of the Bureau of Reclamation. 192 Ariz. at 471, 967 P.2d at 612. The court in *Johnson* found that, because the City of Phoenix at all times asserted its intent to be bound only upon approval from the Bureau of Reclamation, there could be no enforceable oral or written contract until such time. Optima attempts to equate Mr. Hovey with the Bureau of Reclamation by asserting that the agreement was at all times subject to his final approval. The affidavits of Mr. Pilkinton and Mr. Bettenga, however, are a sufficient basis on which a jury may find that Mr. Lenick also had the authority to bind Optima with respect to the settlement terms. (Doc. 56, Ex. U, Ex. S.) Accordingly, *Johnson* is inapplicable and the Court finds that the question of whether Optima and Harmon created a binding oral agreement is one that should be properly

- 6 -

1 submitted to a jury.[2]

2 **II.      A Question of Fact Exists as to Whether Optima Breached the Subcontract**

Harmon alleges that Optima was unjustly enriched because Harmon continued to perform work in reliance on the settlement agreement. (Doc. 55). "It is the well established law of Arizona that in order to prevail upon a theory of unjust enrichment, a plaintiff must establish that, (1) plaintiff conferred a benefit upon the defendant; (2) defendant's benefit is at plaintiff's expense; and (3) it would be unjust to allow defendant to keep the benefit." *USLife Title Co. of Ariz. v. Gutkin*, 152 Ariz. 349, 354, 732 P.2d 579, 584 (Ct. App. 1986). But, "the existence of a contract specifically governing the rights and obligations of each party precludes recovery for unjust enrichment." *Id.* Therefore, Harmon cannot maintain an unjust enrichment claim if the alleged benefit it conferred was required under a contract. *Chandler Med. Bldg. Partners v. Chandler Dental Group*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (Ct. App. 1993). If Optima materially breached the Subcontract, however, Harmon would no longer have been under any obligation to perform the work it completed. *See Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987) (holding that it is a "basic contract law principle that if one party to a contract breaches the agreement, the other party is no longer obligated to perform his or her contractual obligations").

Defendants assert, for the first time, in their reply brief that the Subcontract is not subject to an interpretation requiring that all work be completed within an 18-month time frame, meaning that Harmon was already under a preexisting obligation to perform under the Subcontract. Defendants further imply that Plaintiffs would not be permitted to introduce extrinsic evidence to the contract specifying the conditions under which Plaintiffs would be entitled to equitable adjustments provided for in the contract. The Court does not address these arguments because they were made for the first time in the Reply brief, and it would

---

[2]While Harmon argues that a contract was formed upon the exchange of written documents, this does not preclude its alternative argument that an oral contract was formed first. *AROK*, 174 Ariz. at 299, 848 P.2d at 878.

be unfair to deprive Plaintiff of the opportunity to respond. *See Delgadillo v. Woodford*, 527 F.3d 919, 930 n. 4 (9th Cir. 2008) ("Arguments raised for the first time in [the] reply brief are deemed waived."); *Marlyn Nutraceuticals, Inc. v. Improvita Health Prods.*, 663 F. Supp.2d 841, 848 (D. Ariz. 2009) ("The Court need not consider Defendants' position, however, since it was first raised in their reply brief . . . . Thus, even if the argument has merit, this Court cannot appropriately consider it, since Plaintiffs did not have the opportunity to respond.").

**CONCLUSION**

The Court finds that there are genuine issues of material fact as to whether the parties entered in to a binding settlement agreement. The Court further finds that there remain issues of fact upon which an alternative theory of unjust enrichment may be alleged. Accordingly, Optima's Motion for Summary Judgment is denied.

**IT IS THEREFORE ORDERED** that Optima's Motion for Summary Judgment (Doc. 51) is **DENIED.**

Dated this 30th day of July, 2010.

_____
G. Murray Snow
United States District Judge